**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**
**PHILADELPHIA DIVISION**

| | |
|---|---|
| KIM DOHERTY<br><br>Plaintiff,<br><br>v.<br><br>ADVANCED NEUROMODULATION SYSTEMS, INC A/K/A ABBOTT MEDICAL, and<br><br>ABBOTT LABORATORIES,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES WITH DEMAND FOR JURY TRIAL**<br><br>**SPOTLIGHT JUSTICE PLLC**<br>Dena R. Young (ID No.: 308703)<br>200 Barr-Harbor Drive, Suite 400<br>Conshohocken, PA 19428<br>P: (610) 659-4567<br>dena@spotlightjustice.com<br><br>**BULLOCK LEGAL GROUP, LLC**<br>Carasusana B. Wall (OH0090234) (*PHV forthcoming)*<br>Ameena Alauddin (OH 102588) (*PHV forthcoming)*<br>One Seagate, 550 N Summit St #710<br>Toledo, OH 43604<br>(833) 853-4258<br>(470) 412-6708 (facsimile)<br>Cara@bullocklegalgroup.com<br>Ameena@bullocklegalgroup.com<br><br>*Counsel for Plaintiff* |

1. Kim Doherty, by and through undersigned counsel, brings this Complaint with Jury Demand against Defendants Abbott Laboratories and its Advanced Neuromodulation Systems, Inc. (a/k/a Abbott Medical) (collectively, "Abbott") (collectively, "Defendants"),and alleges as follows:

## I. NATURE OF THE ACTION

2. Plaintiff brings this action for injuries sustained as a direct and proximate result of Defendant's defective Abbott spinal cord stimulator ("SCS") system and Defendant's negligent and intentional conduct.

3. Abbott's SCS systems, including the Proclaim XR (the "Abbott SCS Product" or "SCS Device"), are Class III medical devices approved by the U.S. Food and Drug Administration ("FDA") under Premarket Approval Application No. P010032 (for the Genesis, Eon, Prodigy, Proclaim, Eterna, and FlexBurst360 family of devices) and/or PMA No. P150004 (for the Axium and Proclaim DRG dorsal root ganglion family of devices).[1]

4. The Abbott SCS Products are chronically and dangerously defective. Specifically, the electrical leads and implantable pulse generators ("IPGs") integral to these devices have an unacceptably high rate of failure, including but not limited to lead fracture, insulation breach, lead migration, and IPG/battery malfunction — resulting in permanent neurological injury, including nerve damage, to implanted patients.

5. Making matters worse, Abbott deployed sales representatives to actively participate in the programming and reprogramming of implanted devices in a manner that exceeded the permissible scope of sales representatives under FDA regulations and Pennsylvania law, thereby constituting the unauthorized practice of medicine. These representatives also made false and misleading representations to induce patients to undergo implantation and to discourage patients from seeking removal when complications arose, thereby prolonging patients' exposure to the defective devices and worsening permanent nerve damage.

[1] U.S. Food and Drug Administration, PMA P010032 Approval Record, Advanced Neuromodulation Systems, Inc. (approved November 21, 2001); PMA P010032 Supplement History. Available at: https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?ID=P010032.

6. Furthermore, Abbott deviated from its FDA-approved manufacturing processes and Current Good Manufacturing Practice ("cGMP") regulations in the manufacture of its SCS products, rendering the implanted devices defective in manufacture. Abbott also failed to warn patients and physicians of the true risks of lead failure, IPG/battery failure, and permanent nerve damage.

7. Plaintiff's state-law claims are not preempted by the Medical Device Amendments of 1976 ("MDA"), 21 U.S.C. § 360k(a), because each claim is premised on state-law duties that genuinely parallel, and do not exceed, the specific federal requirements imposed on Defendant by the FDA's PMA approval of P010032 and/or P150004 and implementing regulations.

## II. PARTIES

8. Plaintiff Kim Doherty ("Plaintiff") is and was at all relevant times a resident and citizen of Folsom, Delaware County, Pennsylvania.

9. Plaintiff was implanted with an Abbott SCS system designed, manufactured, and distributed by Defendant.

10. Defendant Abbott Laboratories is a corporation organized under the laws of the State of Illinois, with its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064-6400.[2]

11. Abbott Medical is a trade name for the neuromodulation division and/or subsidiary of Abbott Laboratories called Advanced Neuro Modulation Systems, Inc. (“ANS”) that designs, manufactures, and distributes SCS products, including all products under PMA 10032. ANS’s principal address for neuromodulation operations is 6901 Preston Road, Plano, Texas 75024 and

[2] Abbott Laboratories, Annual Report (Form 10-K) (Feb. 20, 2025), https://www.sec.gov/Archives/edgar/data/1800/000104746913001180/a2212523z10-k.htm.

is the FDA-registered entity of record for PMA P010032 and PMA P150004.[3] Collectively, Abbott Laboratories and ANS are referred to hereafter as "Abbott."

12. Abbott designed, manufactured, marketed, sold, and distributed the SCS products at issue, and conducted business throughout the United States, including within the Eastern District of Pennsylvania, by marketing, selling, and distributing its SCS devices to physicians, hospitals, and patients, and by deploying sales and clinical representatives in this District.

## III. JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to and 28 U.S.C. § 1332. Plaintiff is a citizen of Pennsylvania. Defendant Abbott Laboratories is an Illinois corporation with its principal place of business in Illinois. The amount in controversy exceeds $75,000, exclusive of interests and costs.

14. This Court has personal jurisdiction over Defendant pursuant to 42 Pa. Stat. § 5322 and principles of general and specific personal jurisdiction. Defendant regularly conducts, transacts, and solicits business in Pennsylvania, has marketed and sold its SCS devices to physicians, hospitals, and patients throughout Pennsylvania, has deployed clinical and sales representatives in Pennsylvania, and derives substantial revenue from those activities. Plaintiff's claims arise directly from Defendant's activities in Pennsylvania.

15. Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, including Plaintiff's implantation, post-implantation encounters with Abbott representatives, and resulting injuries.

---

[3] Abbott Medical, Premarket Approval (PMA) No. P010032 (Nov. 21, 2001), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?ID=P010032. See also Abbott Medical, Premarket Approval (PMA) No. P150004 (Feb. 11, 2016), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P150004.

## IV. FACTUAL ALLEGATIONS

### A. Overview of Class III Regulatory Requirements

16. PMA is the FDA process of scientific and regulatory review to evaluate the safety and effectiveness of Class III medical devices. Class III medical devices are those that support or sustain human life, are of substantial importance in preventing impairment of human health, or which present a potential unreasonable risk of illness or injury. Due to the level of risk associated with Class III devices, these devices require PMA application under § 515 of the Federal Food, Drug, and Cosmetic Act ("FDCA") before they can be sold in the United States.[4]

17. In the PMA application, the applicant is required to supply information to the FDA. The information required includes device description, clinical safety trials, methods of its product testing, design of the device, specific manufacturing controls, outcome evaluation, and proposed labeling. The FDA does not conduct independent testing on a medical device in a PMA application. The FDA reviews the documents provided to them by the PMA applicant and relies on the veracity of the company. The PMA applicant is solely responsible for submitting all truthful and necessary documentation to the FDA.

18. Once an application for PMA is approved, the holder (here, Defendant) must comply with any and all post-approval requirements established by statute, the FDA, and federal regulations.

19. In particular, federal regulations require a PMA holder such as Defendant to comply with the following requirements:

a. Adverse Events. Review, evaluate, and report to the FDA adverse events associated with the medical device: (i) Report individual adverse events within 30 days after becoming aware of an adverse event or aware of a reportable death, serious injury or malfunction, 21

[4] 21 U.S.C. § 360e; 21 C.F.R. Part 814.

C.F.R. § 803.10(c)(1); and (ii) Report individual adverse events no later than five workdays after becoming aware of a "reportable event that requires remedial action to prevent an unreasonable risk of substantial harm to the public health," 21 C.F.R. § 803.10(c)(2)(i).

b. Quality System. Establish and maintain a quality system that is appropriate for the specific medical devices designed or manufactured and that meets the requirement of this part. 21 C.F.R. § 820.5;

c. Management Responsibility. Management with executive responsibility shall establish its policy and objectives for, and commitment to quality. 21 C.F.R. § 820.20;

d. Qualified Personnel. Have sufficient personnel with the necessary educational background, training, and experience to assure that all activities required by this part are correctly performed. 21 C.F.R. § 820.25;

e. Corrective and Preventative Action (CAPA). Establish and maintain procedures for implementing corrective and preventive action and document all CAPA activities. 21 C.F.R. § 820.100;

f. Complaint Files. Maintain complaint files, processed in a uniform and timely manner; oral complaints must be documented and must be evaluated to determine whether the complaint represents a reportable event under Medical Device Reporting. 21 C.F.R. § 820.198; and

g. Statistical Techniques. Establish and maintain procedures for identifying valid statistical techniques required for establishing, controlling and verifying the acceptability of process capability and product characteristics. 21 C.F.R. § 820.250.

## B. Overview of Spinal Cord Stimulation Devices

20. SCS devices are Class III implantable neuromodulation systems designed to deliver electrical impulses to the spinal cord's dorsal columns to modulate chronic intractable pain. An SCS system typically consists of an implantable pulse generator ("IPG"), one or more electrical leads placed in the epidural space, extensions connecting the leads to the IPG, and external patient and clinician controllers for programming and adjusting stimulation parameters.

21. SCS devices are classified as Class III medical devices by the FDA, meaning they present the highest risk to patients and require Premarket Approval ("PMA") demonstrating safety and effectiveness before commercialization.[5] Any proposed changes to a PMA-approved device's design, labeling, intended use, or manufacturing process must be submitted to the FDA as a PMA supplement.[6]

22. SCS devices are prescription devices within the meaning of 21 C.F.R. § 801.109 and may only be used by or upon the order of a licensed healthcare practitioner.

23. In September 2020, following a Public Citizen report, the FDA issued a letter to healthcare providers advising that over the preceding four years it had received 107,728 adverse event reports regarding SCS devices, including 30,321 reports of unsatisfactory pain relief and 428 patient deaths.[7] These figures include reports involving Abbott's SCS devices.

24. Post-market published data confirm that SCS devices, including the Abbott SCS Products, are associated with serious complications at high rates. Lead migration and fracture rates have been reported at between 13.2% and 22.6% of implanted patients in published literature, often requiring

[5] 21 U.S.C. § 360e; 21 C.F.R. Part 814.
[6] 21 C.F.R. § 814.39(a).
[7] MedTech Dive, *FDA Flags 428 Spinal Cord Stimulator Patient Deaths, Urges More Tests Before Implanting* (Sept. 4, 2020), available at: https://www.medtechdive.com/news/fda-flags-428-spinal-cord-stimulatorpatient-deaths-urges-more-tests-befor/584714/ (last visited on May 20, 2026).

surgical revision.[8] A 2025 study confirms that up to 40% of SCS patients experience complications from hardware failure (including lead migration and breakage), biological complications (infection, epidural hematoma), or other causes.[9] SCS explant rates have been reported at up to 38%, with most occurring within the first and second year of implantation.[10] Public Citizen's 2020 report independently documented that from 2004 to 2019 the FDA received 220,374 adverse event reports for SCS devices, including 156,817 reports of injuries and 931 reports of patient deaths — figures that include Abbott devices.[11]

### C. Abbott's SCS Products and Regulatory History

25. All Abbott SCS products in the Genesis, Eon, Prodigy, Proclaim, Eterna, and FlexBurst360 family are regulated as Class III medical devices under product code LGW ("Stimulator, Spinal-Cord, Totally Implanted for Pain Relief"), subject to the PMA pathway under 21 U.S.C. § 360e and 21 C.F.R. Part 814. The Axium and Proclaim DRG dorsal root ganglion devices are regulated under product code PMP, subject to the same PMA pathway.[12]

26. Abbott's SCS products operate under two separate PMA numbers. The conventional SCS family — comprising the Genesis, Genesis XP, Eon, Eon Mini, Prodigy, Proclaim, Proclaim XR,

---

[8] ASRA, Complications of Spinal Cord Stimulator Implantation (Aug. 2019) available at: https://asra.com/news-publications/asra-newsletter/newsletter-item/asra-news/2019/08/07/complications-of-spinal-cord-stimulator-implantation. *See also* Kumar K, Hunter G, Demeria D. Spinal cord stimulation in treatment of chronic benign pain: challenges in treatment planning and present status, a 22-year experience. Neurosurgery. 2006;58(3):481–496. https://doi.org/10.1227/01.NEU.0000192162.99567.96. *See also* Mekhail NA, Mathews M, Nageeb F, Guirguis M, Mekhail MN, Cheng J. Retrospective review of 707 cases of spinal cord stimulation: indications and complications. Pain Pract. 2011;11(2):148–153. https://doi.org/10.1111/j.1533-2500.2010.00407.x.

[9] Vanessa Choi Yin Wong et al., *Risk Factors for Spinal Cord Stimulator Explant After Implantation for Neuropathic Pain: A Systematic Review*, Neuromodulation (Mar. 6, 2026), https://doi.org/10.1016/j.neurom.2026.02.001, available at https://www.sciencedirect.com/science/article/pii/S1094715926000280.

[10] Amruta Pai et al., *Spinal Cord Stimulation Explantation and Chronic Pain,* 2025 J. Pain Res. (PMC), PMCID: PMC11929510, at Conclusion (Mar. 17, 2025), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC11929510/.

[11] Public Citizen, *Implanted Spinal Cord Stimulators for Pain Relief*, 1, 5–6 (2020), https://www.citizen.org/wpcontent/uploads/2526_200610_Spinal-Cord-Stimulator-Report_FINAL.pdf.

[12] See LGW - Product Classification, FDA, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpcd/classification.cfm?ID=LGW. The Abbott DRG devices are regulated under product code PMP. See Abbott Medical, Premarket Approval (PMA) No. P150004 (Feb. 11, 2016), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P150004.

Proclaim Plus, Eterna, and FlexBurst360 systems — all operate under PMA P010032, which was originally filed by Advanced Neuromodulation Systems, Inc. ("ANS") and approved by the FDA on November 21, 2001. ANS was acquired by St. Jude Medical in 2005, and St. Jude Medical was in turn acquired by Abbott Laboratories in January 2017. As of early 2026, P010032 has over 230 publicly listed supplements. The Axium and Proclaim DRG dorsal root ganglion neurostimulator systems operate under a separate PMA, P150004, approved February 11, 2016. Abbott is the PMA applicant of record for both P010032 and P150004.[13]

27. The original PMA P010032 was not based on a manufacturer-sponsored, patient-level pivotal IDE clinical trial unique to the Genesis system. Instead, ANS relied on published clinical literature rather than a proprietary controlled trial, and no formal Neurological Devices Advisory Panel meeting was convened before the original Genesis PMA approval.[14]

28. Abbott's successive SCS system generations received approval through PMA supplements to P010032: the Genesis XP through supplement S002 (received May 14, 2002); the Proclaim Family of IPGs through supplement S125 (Normal 180-Day, received October 24, 2016); and BurstDR therapy mode through supplement S136 (30-Day Notice, received November 13, 2017), the first FDA-approved burst stimulation therapy. The Proclaim Plus with FlexBurst360 was approved August 22, 2022; the DPN indication for Prodigy, Proclaim, and Proclaim XR through supplement S189 (approved January 24, 2023); and the NSBP indication for Prodigy, Proclaim XR, Proclaim

[13] Abbott Medical, Premarket Approval (PMA) No. P010032 (Nov. 21, 2001), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?ID=P010032; Abbott Medical, Premarket Approval (PMA) No. P150004 (Feb. 11, 2016), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P150004.

[14] U.S. Food & Drug Admin., Premarket Approval (PMA) P010032: Genesis and Eon Family Neurostimulation (IPG) Systems, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?ID=P010032 (last visited May 20, 2026).

Plus, and Eterna through supplement S191 (approved May 10, 2023). P150004/S002 approved the Proclaim DRG IPG on November 28, 2016.[15]

29. As a condition of PMA approval, Abbott was required to maintain ongoing post-approval obligations under 21 C.F.R. § 814.84, including submission of annual post-approval study reports, timely Medical Device Reports ("MDRs") for serious injuries (within 30 days) and events requiring remedial action (within 5 days), and submission of PMA supplements for any changes to the device's design or manufacturing process.[16] Any failure to meet these obligations constitutes a violation of PMA conditions and potentially a misbranding or adulteration violation under 21 U.S.C. §§ 331 and 351.[17]

30. MAUDE adverse event reports for Abbott's SCS devices document instances of device malfunction, lead failure, IPG/battery failure, and patient injury.[18]

### D. <u>Known Device Failure and Resulting Permanent Nerve Damage</u>

31. The Abbott SCS Products have an unacceptably high rate of failure, including lead fracture, insulation breach, migration from the implantation site, and IPG/battery malfunction causing interruption or alteration of therapy delivery. These failures are not incidental side effects of an otherwise effective therapy; they are evidence of fundamental defects in the design and manufacture of Abbott's leads and IPGs.

32. When SCS leads or components fail, whether by fracturing, breaching insulation, or migrating, the electrical current delivered to the spinal cord is no longer directed to the therapeutic target. Uncontrolled electrical stimulation can cause burning pain, electrical shocking sensations, nerve

---

[15] U.S. Food and Drug Administration, PMA P010032/S189 (DPN indication, approved January 24, 2023); PMA P010032/S191; P010032/S189 SSED available at: https://www.accessdata.fda.gov/cdrh_docs/pdf/P010032S189B.pdf.
[16] 21 C.F.R. §§ 814.82, 814.84, 803.50, 803.53 (2025).
[17] 21 U.S.C. §§ 331(a)–(b), 351 (2025); 21 C.F.R. § 814.82(c) (2025).
[18] U.S. Food and Drug Administration, MAUDE Adverse Event Search — Product Code LGW (Abbott Medical). Available at: https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/results.cfm

irritation, and ultimately permanent nerve damage if the device is not promptly removed. Similarly, when the IPG/battery fails or resets unexpectedly, therapy is disrupted in ways that can cause adverse neurological effects, burns, and require additional surgical intervention.

33. Published peer-reviewed literature reporting real-world SCS outcomes, including Abbott devices, documents post-market lead migration rates ranging from 13.2% to 22.6%, far exceeding the rates disclosed in manufacturer-funded clinical trials.[19] Public Citizen's 2020 report documented that adverse events across SCS device manufacturers include spinal cord damage ranging from muscle weakness to paraplegia, device burns, lead migration, lead fracture, implant-related pain, infection, hematoma, seroma, cerebrospinal fluid leakage, and — in rare cases — chronic scar tissue formation around epidural leads causing spinal compression and myelopathy with paresis and sensory loss.[20]

34. The permanence of nerve damage resulting from delayed device removal is a foreseeable and known consequence of lead failure and IPG/battery malfunction. When a failing or migrated lead continues to deliver uncontrolled stimulation, nerve injury progresses over time. The longer a failing device remains implanted, the greater the potential for permanent neurological harm. Prompt recognition and removal are therefore essential to preventing permanent injury.

35. Representations by Abbott's sales representatives that discouraged or delayed removal, as described herein, directly and foreseeably worsened the permanence and severity of Plaintiff's nerve injuries.

36. Abbott's PMA P010032 supplement history reflects documented device failures warranting urgent regulatory attention. Specifically, PMA P010032 includes at least five Special (Immediate Track) supplements — S024 (January 2008), S034 (October 2010), S035 (October 2010, two

[19] ASRA, supra note 8.
[20] Public Citizen Health Research Group, supra note 11.

urgent-track submissions within two days), S040 (July 2011), and S177 (June 2021). Immediate Track is reserved by the FDA for situations involving significant risk to the health of persons warranting review in less than 180 days. The subject matter of all five Immediate Track supplements is not publicly available and constitutes evidence of undisclosed, urgent corrections to Abbott's SCS platform.[21]

37. On June 26, 2009, the FDA issued a Warning Letter to Advanced Neuromodulation Systems, Inc. (then owned by St. Jude Medical, Abbott's predecessor), specifically citing the Eon IPG generators. At the time of inspection, the company had not completed, implemented, or verified the effectiveness of at least 18 corrective and preventive actions (CAPAs) initiated to correct quality issues with the MTS trial stimulators, implant Eon IPG generators, charging systems, and patient devices. The FDA stated that "the specific violations noted in this letter and in the FDA 483 issued at the closeout of the inspection may be symptomatic of serious problems in your firm's manufacturing and quality control systems." This Warning Letter establishes that as of 2009, the FDA had documented systemic quality system deficiencies including the Eon IPG specifically, and that known safety corrections were not implemented.[22]

38. In May 2011, St. Jude Medical (Abbott's predecessor) issued an Important Medical Device Recall of the Eon Mini IPG. The recall identified defective battery weld failures within the internal battery as the root cause, causing the batteries to leak electrolyte and preventing them from holding

[21] PMA P010032 has at least five Special (Immediate Track) supplements: S024 (Jan. 2008), S034 (Oct. 2010), S035 (Oct. 2010), S040 (July 2011), and S177 (June 2021). PMA P150004 has one Special (Immediate Track) supplement: S048. Immediate Track is reserved by the FDA for situations where there is "significant risk to the health of persons." *See* PMA P010032 Supplement History at: https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?ID=P010032; PMA P150004 Supplement History at: https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P150004.

[22] U.S. Food and Drug Administration, Warning Letter to Advanced Neuromodulation Systems, Inc. (June 26, 2009) (citing failure to complete at least 18 CAPAs for Eon IPG generators; the FDA stated that "the specific violations noted in this letter and in the FDA 483 issued at the close out of the inspection may be symptomatic of serious problems in your firm's manufacturing and quality control systems"). Full text available at: https://www.ofnisystems.com/media/ucm170224.pdf.

a charge, resulting in inability to communicate or recharge the Eon Mini IPG and, ultimately, sudden loss of power and device replacement. This recall is documented evidence that Abbott's predecessor knew of a specific, identified internal battery defect in the Eon Mini IPG and that the defect caused device failure requiring surgical replacement.[23]

39. In July 2023, Abbott issued an Urgent Medical Device Correction for its Proclaim and Infinity IPGs, advising that certain patients were unable to exit MRI mode — disabling therapy delivery and, in some cases, requiring surgical IPG replacement. The FDA classified Abbott's resulting action as a Class I recall — the most serious recall classification, indicating risk of serious injury or death — affecting approximately 155,028 devices distributed from November 21, 2015 through June 29, 2023. Abbott received 186 reported incidents and 73 documented injuries in connection with this device failure.[24]

40. Abbott has also issued multiple product advisories regarding IPG battery and software failures: in September 2017, Abbott identified a software calculation error that caused the Elective Replacement Indicator (ERI) in Proclaim SCS, Proclaim DRG, and Infinity DBS IPG devices to trigger earlier than intended; and in June 2024, Abbott issued a further Urgent Medical Device Correction regarding the Proclaim SCS Family, Proclaim DRG, and Infinity DBS IPG, noting that the duration between the IPG reaching ERI threshold and end of service may be 45%–55% shorter than indicated in the product labeling. Each of these advisories constitutes a documented

[23] St. Jude Medical, Important Medical Device Recall, Eon Mini IPG (May 24, 2011) available at: https://www.neuromodulation.abbott/content/dam/nm/neuromodulation/downloadables/guides/Important_Product_Information_Eon_Mini_May_2011.pdf.

[24] Abbott, Urgent Medical Device Correction, Proclaim and Infinity IPGs — Inability to Exit MRI Mode (July 18, 2023); FDA Class I Recall (September 13, 2023); 155,028 devices distributed November 21, 2015 to June 29, 2023; 186 complaints; 73 injuries. FDA recall record available at: https://www.fda.gov/medical-devices/medical-devicerecalls-and-early-alerts/abbott-medical-recalls-proclaim-and-infinity-ipgs-inability-exit-magnetic-resonanceimaging-mri-mode. See also MedTech Dive (Sept. 14, 2023), available at: https://www.medtechdive.com/news/abbott-neurostimulator-injuries-recall/693650/.

acknowledgment by Abbott that its IPG devices were subject to foreseeable, preventable failures in battery performance and software.[25]

## E. Abbott's Deviations from FDA-Approved Manufacturing Processes and cGMP Regulations

41. Manufacturers of PMA-approved Class III medical devices are required to comply with the FDA's Quality System Regulation ("QSR"), also known as Current Good Manufacturing Practices ("cGMP"), codified at 21 C.F.R. Part 820. These regulations impose non-discretionary, binding legal obligations on Abbott.

42. Upon information and belief, Abbott violated cGMP requirements including, but not limited to:

- 21 C.F.R. § 820.30 (Design Controls): Abbott failed to establish and maintain adequate design controls sufficient to ensure the leads and IPGs of its SCS products conformed to design specifications and performance standards established by the FDA-approved PMA, including specifications governing lead structural integrity, insulation integrity, electrical performance, and IPG/battery reliability.
- 21 C.F.R. § 820.70 (Production and Process Controls): Abbott failed to establish and maintain adequate process controls to ensure the consistent production of leads and IPGs conforming to approved specifications, including failure to identify and control manufacturing variables contributing to lead fracture, insulation failure, and IPG/battery malfunction.
- 21 C.F.R. § 820.75 (Process Validation): Abbott failed to adequately validate its manufacturing processes for leads and IPGs to ensure consistent product conformance,

[25] Abbott, Important Medical Device Advisory (September 12, 2017).; Abbott, Urgent Medical Device Correction, Proclaim SCS Family, Proclaim DRG, Infinity DBS IPG ERI Information (June 2024) available at: https://www.neuromodulation.abbott/us/en/product-advisories.html. *See also* MassDevice (June 13, 2024), available at: https://www.massdevice.com/abbott-warns-some-infinity-dbs-implants/.

including failure to validate processes capable of producing leads and IPGs that maintain their structural integrity and electrical performance under physiological conditions.

• 21 C.F.R. § 820.100 (Corrective and Preventive Action — CAPA): Abbott failed to implement adequate corrective and preventive action in response to known patterns of lead failure and IPG/battery malfunction identified in post-market MAUDE data and field reports — as documented by the FDA's June 2009 Warning Letter, which cited Abbott's predecessor's failure to complete at least 18 open CAPAs — including failure to analyze root causes of lead fractures, insulation breaches, and IPG resets, and to implement effective corrections.

• 21 C.F.R. § 820.198 (Complaint Files): Abbott failed to evaluate post-market complaints regarding lead failure and IPG/battery malfunction systematically and incorporate them into product redesign and labeling revisions.

43. Abbott's SCS products are manufactured at its Plano, Texas neuromodulation facility and at other manufacturing and sterilization sites including those previously operated by Advanced Neuromodulation Systems, Inc. and St. Jude Medical. Each manufacturing site is subject to FDA inspection and to Abbott's obligation to submit PMA supplements for manufacturing site changes. Manufacturing site changes, process changes, and supplier changes each required submission and approval of appropriate PMA supplements before implementation. Abbott was required to maintain identical product quality across all sites.

44. The pattern of lead and device failures in Abbott's SCS products, as documented in MAUDE reports, the 2009 FDA Warning Letter, the 2011 Eon Mini recall, the 2023 Class I recall, and the 2017 and 2024 IPG battery/software advisories, and reflected in Plaintiff's injuries, is consistent with deviations from Abbott's FDA-approved manufacturing specifications and cGMP

requirements. When an SCS lead fractures, breaches its insulation, or migrates in a manner inconsistent with the device's approved design specifications, or when an IPG resets or malfunctions in a manner inconsistent with approved performance standards, the device has deviated from Abbott's approved design specifications, formula, and performance standards.

45. These cGMP violations caused Abbott's defective SCS devices to reach the market and be implanted in Plaintiff. They constitute the parallel state-law duties imposed by Pennsylvania common law,[26] which likewise prohibits the marketing of products that deviate from the manufacturer's design specifications and are unreasonably dangerous. These claims impose the same duty as, rather than a different duty from, the applicable federal requirements.

### F. Abbott's Sales Representatives and the Unauthorized Practice of Medicine

46. At all relevant times, Abbott employed and deployed clinical and sales representatives to assist with and actively participate in the selection, implantation, programming, and post-operative management of its SCS devices in Pennsylvania and throughout the United States at both the trial and permanent device stages.

47. Abbott's sales representatives, including the Representative(s) who interacted with Plaintiff, were not licensed physicians or healthcare providers. Nevertheless, in the course and scope of their employment with Abbott, these representatives routinely:

- Participated in and directed the programming of Plaintiff's SCS device, including selection of stimulation parameters, waveforms, amplitude, and frequency settings, during implantation surgery and post-operative care.

[26] *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 382–83 (Pa. 2014) (reaffirming Pennsylvania's adherence to Restatement (Second) of Torts § 402A and stating that sellers have a duty to market products free from a defective condition unreasonably dangerous to the consumer or the consumer's property).

• Made real-time clinical decisions about device settings based on their own assessment of patient responses, substituting their judgment for that of Plaintiff's licensed treating physician.

• Advised Plaintiff and Plaintiff's physicians about medical treatment decisions concerning the SCS device, including recommendations to continue implantation therapy, undergo reprogramming, and delay or decline device removal.

• Directly reprogrammed Plaintiff's SCS device on post-operative occasions, including on occasions when Plaintiff's treating physician was not present.

• Made representations directly to Plaintiff — acting as medical advisors — about the expected therapeutic outcomes of the device, the significance and etiology of complications Plaintiff was experiencing, and the anticipated results of device reprogramming, in a manner intended to and having the effect of influencing Plaintiff's treatment decisions.

48. Pennsylvania law prohibits the practice of medicine without a valid license. Pennsylvania law provides that the no person expect for a medical doctor shall engage in the "practice of medicine and surgery, purport to practice medicine and surgery, hold forth as authorized to practice medicine and surgery through use of a title ..., and otherwise hold forth as authorized to practice medicine and surgery."[27] Pennsylvania law defines "medicine and surgery" as "the art and science of which the objectives are the cure of diseases and the preservation of the health of man, including the practice of the healing art with or without drugs, except healing by spiritual means or prayer."[28]

49. These activities constituted the practice of medicine within the meaning of 63 Pa. Stat. § 422.2, performed without a license in violation of 63 P.S § 422.10. Additionally, 63 Pa. Stat. § 422.39

[27] 63 P.S § 422.10.
[28] 63 P.S. § 422.2.

provides that any person who practices medicine while not being licensed to do so in Pennsylvania will be guilty of a misdemeanor in the third degree and may be subject to civil penalties by a vote of the majority of the State Board of Medicine.

50. Abbott's sales representatives also made materially false and misleading statements to Plaintiff concerning: (a) the effectiveness of the SCS device in providing long-term pain relief; (b) the safety profile of the device, including the risks of lead failure, IPG/battery failure, and nerve damage; (c) the significance of complications Plaintiff was experiencing, which representatives falsely characterized as minor, adjustable issues rather than as symptoms of device failure; and (d) the likely outcome of continued reprogramming, which representatives falsely represented would resolve Plaintiff's complications.

51. These misrepresentations were made to induce Plaintiff to (a) agree to the initial implantation of the SCS device, and (b) delay or forgo removal of the device after complications arose.

52. Upon information and belief, Abbott's representatives were authorized and directed by Abbott to engage in this conduct as part of Abbott's device sales and clinical support model. Abbott's compensation structure for its sales and clinical representatives created incentives for representatives to prioritize device sales and continued implantation over the medical welfare of patients.

### G. Abbott's Corporate Scheme and Institutional Responsibility

53. The clinical and sales representatives supporting Abbott's SCS devices were employees and/or agents of Abbott and acting within the scope of that relationship while interacting with patients and respective devices as described herein.

54. The conduct of Abbott's sales and clinical representatives described herein was not incidental or isolated. It was the product of a deliberate corporate structure and policy by which Abbott

institutionalized the participation of its sales and clinical representatives in the practice of medicine, despite knowing this conduct was unauthorized under state law.

55. Similarly, the widespread and systemic use of false and misleading statements by Abbott's clinical and sales representatives was not isolated or incidental. Rather, it was the product of a deliberate corporate structure and policy by which Abbott incentivized and institutionalized the practice of its representatives' use of false and misleading statements to encourage implantation of its devices, minimize patient concerns, and discourage removal of defective devices.

56. Abbott knew, or in the exercise of reasonable care should have known, that its representatives were: (a) programming and reprogramming SCS devices in ways that constituted the practice of medicine; (b) making medical recommendations and representations to patients outside the representatives' permissible scope; and (c) misleading patients about device performance and complications.

57. Abbott failed to take reasonable steps to prevent, stop, or correct this conduct. Specifically, Abbott: (a) failed to establish and enforce adequate policies limiting the scope of its representatives' participation in device programming to permissible technical support activities; (b) failed to train its representatives on the legal limits of their permissible conduct; (c) failed to supervise its representatives to ensure compliance with applicable law and company policy; and (d) retained representatives whom it knew or should have known were engaging in impermissible conduct.

58. As a direct and proximate result of Abbott's institutional conduct, Plaintiff was induced to undergo SCS implantation, was misled about device performance, and was dissuaded from seeking timely removal of the device after complications arose, thereby sustaining permanent nerve damage that would not have occurred or would have been less severe but for Defendant's conduct.

### H. Plaintiff's Individual Allegations

59. Plaintiff Kim Doherty is a resident of Folsom, Delaware County, Pennsylvania and a citizen of the State of Pennsylvania.

60. On or about April 4, 2019, Plaintiff was permanently implanted with an Abbott SCS Device, specifically the Proclaim XR, Model No. 3660 Serial No. BCX858.1, along with associated Abbott leads and IPG components (collectively, the "Device"), at Lankenau Medical Center in Wynnewood, Pennsylvania.

61. Following the trial period, the Representative(s) made representations that the permanent device would work like the trial and would provide continued or improved pain relief.

62. Plaintiff initially experienced some relief following implantation. Beginning on or about June of 2020, Plaintiff began to experience loss of pain relief, intense worsening pain and additional pain, and ongoing health complications and other neurological symptoms.

63. Following these symptoms, Plaintiff underwent revision on August 19, 2021 where Plaintiff was permanently implanted with an Abbott SCS Device, specifically the Proclaim XR, Model No. 3660 Serial No. BCX858.1, along with associated Abbott leads and IPG components (collectively, the "Device") at Lankenau Medical Center by Dr. Jain Gaurav. Plaintiff experienced no meaningful pain relief after this implantation. Beginning on or about February 2022, Plaintiff began experiencing urinary incontinence and increased pain. Plaintiff has had the Device removed. The Device was removed on or about February 23, 2024 by Dr. Jain Gaurav.

64. Prior to and during both implantation processes, Plaintiff interacted with Abbott sales and clinical representatives, ("the Representative(s)"). The Representative(s) actively participated in both the selection and implantation processes, including attending the implant procedure, directing or participating in the intraoperative programming of the Device, and communicating directly with Plaintiff and Plaintiff's treating physician about the Device and its expected benefits.

65. Prior to both implantations, the Representative(s) represented to Plaintiff that the Device would provide reliable, long-term pain relief, that the Device was safe for long-term implantation; that the Device was supported by clinical evidence of safety and effectiveness; and that any initial adjustments or reprogramming would optimize therapeutic outcomes. he Representative(s) failed to advise Plaintiff of the known risk of lead failure, the risk of IPG/battery failure, the risk of permanent nerve damage resulting from lead or IPG failure, and the risk that complications would not be resolvable through reprogramming alone.

66. Plaintiff reasonably relied on the Representative(s)' representations in consenting to the trial implantation of an Abbott SCS device. Had Plaintiff been fully and accurately informed of the risks of lead failure, IPG/battery failure, and permanent nerve damage, Plaintiff would not have consented to the implantation or would have elected an alternative treatment.

67. On multiple occasions following the onset of complications, Plaintiff was contacted by or met with the Representative(s), who: (a) attributed Plaintiff's symptoms to sub-optimal device settings rather than device failure; (b) represented that reprogramming would resolve Plaintiff's complications; (c) reprogrammed the Device, in some instances without Plaintiff's treating physician present; and (d) advised Plaintiff to keep the Device implanted and to continue undergoing reprogramming rather than seeking removal.

68. Plaintiff reasonably relied on the Representative(s)' representations and delayed seeking removal of the Device. As a direct result of this delay, Plaintiff sustained worsening neurological injury. The longer the Device — which was causing uncontrolled, injurious electrical stimulation due to lead failure and/or IPG malfunction — remained implanted, the more severe and permanent Plaintiff's nerve damage became.

69. Plaintiff reasonably relied on the Representative(s)' representations in consenting to the permanent implantation of the Device. Had Plaintiff been fully and accurately informed of the risks of lead failure, IPG/battery failure, and permanent nerve damage, Plaintiff would not have consented to the implantation or would have elected an alternative treatment.

70. As a direct and proximate result of the defective Device and Defendant's conduct, Plaintiff has sustained and continues to sustain the following injuries and damages: incontinence, chronic pain, and past and future medical expenses.

71. Plaintiff did not discover the probable causal connection between the Device, Defendant's conduct, and Plaintiff's injuries before June 4, 2026.

72. Plaintiff did not discover the defects and unreasonably dangerous condition of Defendant's Products, including but not limited to the defective leads, inadequate safety features, and the risks associated with their use — including but not limited to lead fracture, insulation breach, lead migration, IPG/battery malfunction, and resulting nerve damage — and could not have discovered the defects and unreasonably dangerous condition of Defendant's Products and the risks associated with their use until recently, due to Defendant's failure to warn, suppression of material information about the risks of the Products, and the active concealment by Defendant's sales representatives of any defect or fault on Defendant's part. Plaintiff further did not know, and could not have known with reasonable diligence, that Defendant's conduct was the cause of Plaintiff's injuries. Any knowledge Plaintiff had about the general risks of spinal cord stimulator implantation is distinct from the knowledge of Defendant's culpable conduct and the basis of a cause of action, the latter having been gained within the applicable statute of limitation and repose periods.

73. Each Defendant had a duty to disclose that its Products were unreasonably dangerous, including disclosing the true rates of lead failure, the known risk of lead fracture and migration

causing permanent nerve damage, the risk of IPG/battery failure causing uncontrolled stimulation, the limitations of reprogramming as a remedy for hardware failure, and that the use of Defendant's SCS Devices carried with it the serious risk of developing the injuries of which Plaintiff complains herein. Defendant breached that duty.

74. Neither Plaintiff nor the general public had knowledge of, nor any reasonable means of discovering, the harmful conditions in Defendant's SCS Devices or the true risks associated with their use at the time Plaintiff received and used Defendant's SCS Devices.

75. Defendant did not notify, inform, or disclose to Plaintiff or the general public that its SCS Devices were unreasonably dangerous, including failing to disclose the true rates of lead failure and migration, the inadequacy of post-implant reprogramming to address hardware defects, the risk of progressive and permanent nerve damage resulting from a retained defective device, and that the use of Defendant's SCS Devices carried with it the serious risk of developing the injuries of which Plaintiff complains herein.

76. Because Defendant failed in its duty to notify Plaintiff and the general public that its SCS Devices were unreasonably dangerous, and because Defendant's sales representatives actively concealed from Plaintiff the existence of any defect or fault on Defendant's part — including by attributing Plaintiff's symptoms to causes other than device failure and by representing that reprogramming would resolve Plaintiff's complaints — Defendant should be estopped from asserting defenses based on statutes of limitation or repose, including but not limited to any theories of equitable tolling or contra non valentem.

77. Further, the relationship between Plaintiff's injuries and Defendant's conduct — including the defective leads and IPGs, the failure of Defendant to disclose known post-market complication data, and the active concealment of device defects by Defendant's sales representatives — was

inherently difficult to discover, in part due to Defendant's knowing suppression of material safety and risk information, and Plaintiff had no actual or constructive knowledge of the causal relationship between Plaintiff's injuries and the use of Defendant's SCS Devices.

78. Some of Plaintiff's injuries are latent in nature, developing progressively over time following implantation of a defective device, such that while symptoms became apparent upon onset, Plaintiff did not know and could not reasonably have known that those symptoms were caused by a defect in Defendant's SCS Devices rather than by other conditions or the natural course of Plaintiff's underlying diagnosis.

79. Plaintiff is a lay individual who was, until recently, unaware that exposure to Defendant's SCS Devices and the defects therein — including defective leads prone to fracture, migration, and insulation breach, and defective IPGs/batteries prone to malfunction and unexpected reset — could cause or contribute to the permanent nerve damage and other injuries of which Plaintiff complains, and who reasonably relied on representations by Defendant's sales representatives that the device was functioning properly and that Plaintiff's symptoms had causes unrelated to any device defect.

80. Plaintiff was unaware of any publicly available information sufficient to put Plaintiff on notice of a causal association between exposure to Defendant's SCS Devices and the injuries suffered, particularly given Defendant's active concealment of post-market complication data and the affirmative misrepresentations of Defendant's sales representatives that no defect existed.

## V. CAUSES OF ACTION

## COUNT I: STRICT LIABILITY — MANUFACTURING DEFECT

Pursuant to Pennsylvania Common Law

81. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

82. At all times relevant to this action, Defendant was the manufacturer and/or distributor that designed, produced, created, made, constructed, and/or assembled the SCS device that was placed into the stream of commerce.

83. The SCS device was expected to, and did, reach the ultimate user, including Plaintiff, without substantial change in condition.

84. The Device implanted in Plaintiff — including the Abbott SCS leads and IPG/battery — was defective in manufacture. The Device deviated materially from Abbott's FDA-approved design specifications, formula, and performance standards for the leads and IPG, including specifications governing structural integrity, insulation integrity, electrical performance, and IPG/battery reliability. As manufactured and as implanted in Plaintiff, the Device failed to maintain its structural integrity and electrical insulation, and/or the IPG failed to maintain its programmed operational parameters, resulting in lead fracture, insulation breach, and/or migration causing uncontrolled electrical stimulation and nerve injury, and/or IPG/battery malfunction causing disruption of therapy.

85. Defendant violated non-discretionary federal manufacturing and quality system regulations in the production of the Device, specifically:

- 21 C.F.R. § 820.30: Failure to implement adequate design controls to ensure products conform to approved design specifications;
- 21 C.F.R. § 820.70: Failure to establish adequate production and process controls to ensure product conformity;
- 21 C.F.R. § 820.75: Failure to validate manufacturing processes capable of consistently producing leads and IPGs conforming to approved specifications;

- 21 C.F.R. § 820.100: Failure to implement corrective and preventive action in response to known patterns of lead failure and IPG/battery malfunction; and
- 21 C.F.R. § 820.198: Failure to evaluate and act upon post-market complaints regarding lead failure and IPG/battery malfunction.

86. Because of Defendant's failures to implement adequate design controls, establish adequate production and process controls, validate manufacturing processes, implement corrective and preventive action in response to known patterns of lead failure and IPG/battery malfunction, and take adequate corrective action, the SCS Device implanted in Plaintiff deviated in a material way from the design specifications, formula, or performance standards of the manufacturer, or from otherwise identical units manufactured to the same design specifications, formula, or performance standards and thus violated state law requirements that parallel federal requirements.

87. These defects existed at the time the Device left Defendant's control and were not detectable by Plaintiff or Plaintiff's treating physicians through reasonable inspection prior to implantation.

88. Defendant's SCS Device was defective in that at the time it left control of Defendant, the foreseeable risks associated with its design exceeded the benefits associated with that design, including but not limited to IPG/battery malfunction, burns and nerve injury.

89. The SCS Device was in an unsafe, defective, and inherently dangerous condition which was unreasonably dangerous to its users and, in particular, Plaintiff.

90. At all times herein mentioned, the SCS Device was in a defective condition and unsafe, and Defendant knew, or had reason to know, that it was defective and unsafe, especially when used as instructed by Defendant and its agents and in the form and manner provided by Defendant and its agents.

91. Had Defendant complied with the Current Good Manufacturing Practices, 21 CFR 820 regulations and parallel state requirements under Pennsylvania law,[29] the defect in Plaintiff's device would not have occurred and/or would have been timely discovered so as to prevent Plaintiff from receiving a defective, malfunctioning SCS Device.

92. Plaintiff's manufacturing defect claim is premised on the parallel state-law duty imposed by Pennsylvania law, which prohibits the marketing of products that deviate from the manufacturer's design specifications and are unreasonably dangerous when they leave the manufacturer's control. This claim imposes the same duty as, and does not exceed, the applicable federal requirements.

93. As a direct and proximate result of Defendant's manufacturing defects and violations of state law, Plaintiff suffered the injuries and damages described herein, including loss of pain relief, incontinence, and other losses including mental anguish, diminished enjoyment of life, medical, health and incidental and related expenses.

94. WHEREFORE, Plaintiff demands judgment against Defendant Abbott for compensatory damages, punitive damages where permitted, attorneys' fees where allowed by statute, costs of suit, pre- and post-judgment interest, and all such other and further relief as the Court deems just and proper.

## COUNT II: STRICT LIABILITY — DESIGN DEFECT

95. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

96. At all times relevant to this action, Defendant was the manufacturer and/or distributor that designed, produced, created, made, constructed, and/or assembled the SCS Device that was placed into the stream of commerce.

---

[29] *Webb v. Zern*, 220 A.2d 853 (Pa. 1966).

97. The SCS Device was expected to, and did, reach the ultimate users, including Plaintiff, without substantial change in condition.

98. The Abbott SCS devices were defective in design because the foreseeable risks of the lead and IPG design exceeded the benefits of that design. These risks, which include but are not limited to IPG/battery malfunction, burns and nerve injury, weighed against the availability of alternative lead and IPG designs offering superior fixation, structural integrity, and battery reliability, exceed the benefits.

99. A practical and technically feasible alternative design was available at the time the leads and IPGs left Defendant's control that would have prevented the harm without substantially impairing the usefulness or intended purpose of the product.

100. Specifically, alternative lead designs providing superior mechanical fixation, improved insulation integrity, and better lead anchoring mechanisms were available and were used in surgical/paddle leads offered in other SCS Devices. Alternative IPG designs with more robust firmware and battery management systems were also available. These alternative designs would have reduced the risk of lead migration, fracture, IPG malfunction, uncontrolled electrical exposure, burns and nerve damage without substantially impairing the therapeutic utility of the SCS device.

101. Additionally, and independently, Defendant made material changes to the design of its SCS leads and IPGs following original PMA approval without submitting the required PMA supplements under 21 C.F.R. § 814.39(a), or through PMA supplements that failed to comply with applicable regulations. These unauthorized design changes altered the leads' and IPGs' structural and performance characteristics in ways that were not evaluated by the FDA and were not disclosed to Plaintiff or Plaintiff's treating physicians. Defendant's failure to submit required PMA

supplements for these design changes violated both federal regulations and the parallel state-law duty not to market an SCS product containing unapproved and undisclosed design modifications.

102. Plaintiff's design defect claim is premised on the parallel state-law duty under Pennsylvania law not to market products with designs whose foreseeable risks exceed benefits. See e.g., *Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014). This claim imposes the same duty as, and does not exceed, the applicable federal requirements.

103. These defects existed at the time the Device left Defendant's control and were not detectable or otherwise known by Plaintiff or Plaintiff's treating physicians through reasonable inspection prior to implantation or other due diligence.

104. The SCS Device was in an unsafe, defective, and inherently dangerous condition which was unreasonably dangerous to its users and, in particular, Plaintiff.

105. The intended or actual utility of the SCS Device is not of such benefit to justify the risks described herein.

106. At all times herein mentioned, the SCS Device was in a defective condition and unsafe, and Defendant knew, or had reason to know, that it was defective and unsafe, especially when used as instructed by Defendant and its agents and in the form and manner provided by Defendant and its agents.

107. As a direct and proximate result of Defendant's design defects and violations of state law, Plaintiff suffered the injuries and damages described herein, including experience loss of pain relief, intense worsening pain and additional pain, incontinence, and ongoing health complications and other neurological symptoms, and other losses including mental anguish, diminished enjoyment of life, medical, health and incidental and related expenses.

108. WHEREFORE, Plaintiff demands judgment against Defendant Abbott for compensatory damages, punitive damages where permitted, attorneys' fees where allowed by statute, costs of suit, pre- and post-judgment interest, and all such other and further relief as the Court deems just and proper.

## COUNT III: STRICT LIABILITY — FAILURE TO WARN

Pursuant to Pennsylvania Common Law

109. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

110. At all times relevant to this action, Defendant was the manufacturer and/or distributor that designed, produced, created, made, constructed, and/or assembled the SCS Device that was placed into the stream of commerce.

111. The SCS Device was expected to, and did, reach the ultimate users, including Plaintiff, without substantial change in condition.

112. Defendant knew at the time Plaintiff's SCS Device was marketed, or in the exercise of ordinary care should have known, through post-market surveillance, MAUDE reports, clinical data, and field reports, of the following risks associated with its SCS leads and IPGs: (a) the high risk of lead fracture, insulation breach, and migration under physiological conditions; (b) the risk of IPG/battery malfunction and unexpected reset; (c) the risk of permanent nerve damage resulting from continued exposure to uncontrolled electrical stimulation from failing leads or malfunctioning IPGs; (d) the risk that complications would not be resolvable through device reprogramming alone; and (e) the risk that delay in device removal following lead failure or IPG malfunction would result in increasingly severe and ultimately permanent neurological injury.

113. Defendant breached its duty to warn Plaintiff and Plaintiff's treating physicians by:

- Failing to update the IFU and device labeling to adequately disclose the known post-market rates of lead failure, IPG/battery malfunction, and the risk of permanent nerve damage resulting therefrom, in violation of 21 C.F.R. § 814.39(d);
- Failing to timely submit Medical Device Reports to the FDA for serious injuries and device failures consistent with those experienced by Plaintiff, in violation of 21 C.F.R. § 803.50;
- Failing to investigate, evaluate, and act upon post-market complaints regarding lead failure and IPG/battery malfunction, in violation of 21 C.F.R. § 820.198;
- Actively conveying, through Defendant's sales and clinical representatives, information to Plaintiff that contradicted, downplayed, and undermined the approved labeling's risk disclosures, including by misrepresenting the significance of Plaintiff's complications and the efficacy of reprogramming as a remedy; and
- Failing to warn Plaintiff, Plaintiff's physicians, and the public that device reprogramming could not cure lead failure or IPG/battery malfunction and that delay in removal following device failure would worsen nerve injury.

114. The risks Defendant failed to warn of were not open and obvious risks nor were they a matter of common knowledge.

115. Plaintiff and Plaintiff's treating physicians justifiably relied on Defendant's representations and omissions. Had adequate warnings been provided, Plaintiff would not have consented to implantation of the Device, and would have sought prompt removal upon the onset of complications, thereby preventing or mitigating permanent nerve damage.

116. Any warnings provided to Plaintiff's physician or other legally authorized person were inadequate given the direct interaction between Plaintiff and Defendant's agents, particularly in

light of those agents' representations which contradicted, downplayed or otherwise refuted the warnings or instructions provided by Defendant. Plaintiff reasonably relied upon the representations of those agents.

117. Plaintiff's failure-to-warn claim is premised on parallel state-law duties under the Pennsylvania common law that mirror Defendant's federal obligations under 21 C.F.R. §§ 803.50, 814.39(d), and 820.198. See e.g., *Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014)

118. As a direct and proximate result of Defendant's failure to warn and violations of state law, Plaintiff suffered the injuries and damages described herein, including experience loss of pain relief, intense worsening pain and additional pain, incontinence, and ongoing health complications and other neurological symptoms, and other losses including mental anguish, diminished enjoyment of life, medical, health and incidental and related expenses.

119. WHEREFORE, Plaintiff demands judgment against Defendant Abbott for compensatory damages, punitive damages where permitted, attorneys' fees where allowed by statute, costs of suit, pre- and post-judgment interest, and all such other and further relief as the Court deems just and proper.

**COUNT IV: CORPORATE NEGLIGENCE**

120. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

121. Separate and apart from vicarious liability for the acts of its sales representatives, Defendant owed Plaintiff a direct, non-delegable corporate duty of care arising from Defendant's own institutional conduct.

122. Defendant knew or should have known its sales and clinical representatives were engaged in the unauthorized practice of medicine and were making material misrepresentations to patients,

and Defendant constructed and maintained the corporate structure and compensation scheme that enabled and incentivized this conduct.

123. Defendant breached its corporate duty of care by: (a) designing and implementing a business model that deployed sales and clinical representatives in the operating room and in post-operative care settings in a role that exceeded permissible technical support and constituted the practice of medicine; (b) establishing a compensation structure that financially incentivized representatives to maximize device implantations and discourage device removal; (c) failing to establish adequate policies and procedures limiting representatives to permissible conduct; (d) failing to train, supervise, and discipline representatives to ensure compliance with applicable state medical practice laws; and (e) affirmatively directing and ratifying the representatives' unlawful conduct.

124. Defendant's corporate negligence was a direct and proximate cause of Plaintiff's injuries, including Plaintiff's initial implantation of the Device based on misrepresentations, Plaintiff's delayed removal of the Device based on continuing misrepresentations, and the resulting permanent nerve damage.

125. WHEREFORE, Plaintiff demands judgment against Defendant Abbott for compensatory damages, punitive damages where permitted, attorneys' fees where allowed by statute, costs of suit, pre- and post-judgment interest, and all such other and further relief as the Court deems just and proper.

## COUNT V: VICARIOUS LIABILITY

126. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

127. At all relevant times, Abbott's sales and clinical representatives, including the Representative(s) identified herein, were employees or agents of Abbott acting within the course

and scope of their employment and/or agency relationship with Abbott in all respects relevant to this action.

128. The Representative(s)' conduct — including actively participating in device selection, actively participating in device programming, making medical representations to Plaintiff, and advising Plaintiff on treatment decisions regarding the Device — was undertaken in furtherance of Abbott's business interests, within the scope of the Representative(s)' assigned duties, and in the manner authorized, directed, or ratified by Abbott.

129. Under the respondeat superior doctrine, Defendant is vicariously liable for all of the Representative(s)' negligent and unlawful acts and omissions committed within the scope of their employment and agency, including: (a) the unauthorized practice of medicine; (b) making false and misleading representations to Plaintiff; and (c) advising Plaintiff to delay removal of the Device, thereby causing and worsening Plaintiff's permanent nerve damage.

130. As a direct and proximate result of Defendant's vicarious liability for the Representative(s)' conduct, Plaintiff suffered the injuries and damages described herein, including loss of pain relief, intense worsening pain and additional pain, incontinence, and ongoing health complications and other neurological symptoms, and other losses including mental anguish, diminished enjoyment of life, medical, health and incidental and related expenses.

131. WHEREFORE, Plaintiff demands judgment against Defendant Abbott for compensatory damages, punitive damages where permitted, attorneys' fees where allowed by statute, costs of suit, pre- and post-judgment interest, and all such other and further relief as the Court deems just and proper.

**COUNT VI: NEGLIGENCE PER SE — UNAUTHORIZED PRACTICE OF MEDICINE**

132. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

133. Pennsylvania law prohibits the practice of medicine without a valid license. Pennsylvania law provides that the no person expect for a medical doctor shall engage in the "practice of medicine and surgery, purport to practice medicine and surgery, hold forth as authorized to practice medicine and surgery through use of a title ..., and otherwise hold forth as authorized to practice medicine and surgery."[30] Any person who practices medicine while not being licensed to do so in Pennsylvania will be guilty of a misdemeanor in the third degree and may be subject to civil penalties by a vote of the majority of the State Board of Medicine.[31]

134. These statutes are designed to protect patients from unqualified persons making medical treatment decisions, and Plaintiff is a member of the class of persons these statutes were designed to protect. The harms Plaintiff suffered — permanent nerve damage caused by the prolonged implantation of a failing device at the direction of unlicensed representatives — are precisely the type of harms these statutes were designed to prevent.

135. Abbott's sales and clinical representatives, acting within the scope of their employment with and as agents of Abbott, violated 63 Pa. Stat. §§ 422.39 by engaging in the practice of medicine — specifically, by advising, recommending, and administering device treatment (including programming, reprogramming, and medical recommendations) for the relief of Plaintiff's pain and other medical conditions — without being licensed to practice medicine in the State of Pennsylvania.

[30] 63 Pa. Stat. § 422.10.
[31] 63 Pa. Stat. § 422.39.

136. The Representative(s)' conduct of programming and reprogramming Plaintiff's implanted SCS device, advising Plaintiff on treatment decisions, and making medical determinations about the appropriate device settings for Plaintiff's condition constituted the practice of medicine within the meaning of 63 Pa. Stat. §§ 422.10. This conduct was performed for compensation — as the representatives were compensated by Abbott based on, inter alia, continued use and deployment of Abbott's SCS devices.

137. Defendant's violation of 63 Pa. Stat. §§ 422.39 constitutes negligence per se under Pennsylvania law. Plaintiff need not separately prove that the conduct was unreasonable; the violation of these statutes establishes breach of duty as a matter of law.

138. Defendant's violations of 63 Pa. Stat. §§ 422.39 were a direct and proximate cause of Plaintiff's injuries. Specifically, because Plaintiff relied on the representations of the Representative(s), who were masquerading as qualified clinical advisors, Plaintiff consented to implantation of the Device and delayed its removal after complications arose, thereby sustaining permanent neurological injury.

139. This claim is based entirely on state law violations and is not preempted by the MDA or the FDCA.

140. As a direct and proximate result of Defendant's violation of these laws, Plaintiff suffered the injuries and damages described herein, including experience loss of pain relief, incontinence, and other neurological symptoms, and other losses including mental anguish, diminished enjoyment of life, medical, health and incidental and related expenses.

141. WHEREFORE, Plaintiff demands judgment against Defendant Abbott for compensatory damages, punitive damages where permitted, attorneys' fees where allowed by statute, costs of

suit, pre- and post-judgment interest, and all such other and further relief as the Court deems just and proper.

**COUNT VII: NEGLIGENT SUPERVISION**

142. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

143. Defendant owed a duty to Plaintiff to adequately supervise its sales and clinical representatives to ensure those representatives did not: (a) engage in the unauthorized practice of medicine; (b) make material misrepresentations to patients regarding the safety and efficacy of Defendant's SCS devices; or (c) advise patients to retain failing devices contrary to those patients' medical interests.

144. Defendant knew or, in the exercise of reasonable care, should have known that its representatives were engaging in the unauthorized practice of medicine, making material misrepresentations to patients, and inducing patients to delay device removal. This knowledge arose from, among other sources: (a) the nature of the representatives' assigned roles, which placed them in clinical settings with patients and physicians; (b) the compensation structure, which incentivized the conduct described herein; and (c) actual notice through complaints, adverse event reports, and publicly filed litigation.

145. Defendant breached its duty of supervision by failing to adequately monitor, review, and correct the conduct of its representatives; by failing to implement and enforce compliance protocols limiting representatives to permissible non-medical technical support activities; and by failing to take corrective action upon learning of instances of impermissible conduct.

146. Defendant's breach of its supervisory duty was a direct and proximate cause of Plaintiff's injuries, in that the absence of adequate supervision allowed the Representative(s)' unlawful

conduct to continue unchecked, resulting in Plaintiff's implantation and delayed removal of a defective device and the permanent nerve damage resulting therefrom.

147. As a direct and proximate result of Defendant's negligent supervision, Plaintiff suffered the injuries and damages described herein, including loss of pain relief, intense worsening pain and additional pain, incontinence, and ongoing health complications and other neurological symptoms, and other losses including mental anguish, diminished enjoyment of life, medical, health and incidental and related expenses.

148. WHEREFORE, Plaintiff demands judgment against Defendant Abbott for compensatory damages, punitive damages where permitted, attorneys' fees where allowed by statute, costs of suit, pre- and post-judgment interest, and all such other and further relief as the Court deems just and proper.

## COUNT VIII: NEGLIGENT TRAINING

149. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

150. Defendant owed a duty to Plaintiff to adequately train its sales and clinical representatives on: (a) the legal scope of their permissible activities in clinical settings, including the prohibition on the unauthorized practice of medicine; (b) the accurate, truthful, and complete disclosure of the risks and limitations of the Abbott SCS Products to patients and physicians; and (c) the proper response to patient complaints, complications, and signs of device failure, including advising patients to seek timely medical evaluation and, where warranted, device removal.

151. Defendant breached its duty to train its representatives by: (a) failing to provide training on the applicable legal prohibitions on the unauthorized practice of medicine; (b) training representatives to minimize, dismiss, and counter patient concerns about device complications and

to encourage continued device use regardless of patient symptoms; (c) training representatives to represent that reprogramming would resolve complications without disclosing that reprogramming cannot remediate lead failure or IPG/battery malfunction; and (d) failing to train representatives on the known risk of permanent nerve damage arising from delayed removal of a failing device. In doing so, Defendant failed to act with reasonable care and knew, or should have known, that its training was inadequate.

152. Defendant's breach of its duty to train its representatives was a direct and proximate cause of Plaintiff's injuries. Had the Representative(s) been adequately trained, they would not have engaged in the unauthorized practice of medicine with respect to Plaintiff, would not have made material misrepresentations about device performance and the significance of complications, and would not have discouraged Plaintiff from seeking timely removal of the failing Device.

153. As a direct and proximate result of Defendant's negligent training, Plaintiff suffered the injuries and damages described herein, including loss of pain relief, intense worsening pain and additional pain, incontinence, and ongoing health complications and other neurological symptoms, and other losses including mental anguish, diminished enjoyment of life, medical, health and incidental and related expenses.

154. WHEREFORE, Plaintiff demands judgment against Defendant Abbott for compensatory damages, punitive damages where permitted, attorneys' fees where allowed by statute, costs of suit, pre- and post-judgment interest, and all such other and further relief as the Court deems just and proper.

## COUNT IX: NEGLIGENT RETENTION

155. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

156. Defendant owed a duty to Plaintiff to not retain sales and clinical representatives whom it knew, or in the exercise of reasonable care should have known, were engaging in conduct that posed an unreasonable risk of harm to patients, including by engaging in the unauthorized practice of medicine and making material misrepresentations to induce device implantation and discourage removal.

157. Upon information and belief, Defendant knew or should have known that the Representative(s) who interacted with Plaintiff had, prior to their interactions with Plaintiff, engaged in the same pattern of conduct with other patients and in other clinical settings — engaging in the unauthorized practice of medicine, making misleading representations, and improperly discouraging device removal.

158. This knowledge arose from, inter alia, the systemic nature of the conduct (which reflected Defendant's institutional practices rather than individual deviation), prior patient complaints, and prior adverse event reports.

159. Despite this knowledge, Defendant retained the Representative(s) in their positions, and the Representative(s) continued to engage in this conduct with Plaintiff. Defendant's decision to retain the Representative(s) in these roles, despite knowledge of their propensity for the conduct described herein, was a direct and proximate cause of Plaintiff's injuries.

160. As a direct and proximate result of Defendant's negligent retention of its agents, Plaintiff suffered the injuries and damages described herein, including loss of pain relief, intense worsening pain and additional pain, incontinence, and ongoing health complications and other neurological symptoms, and other losses including mental anguish, diminished enjoyment of life, medical, health and incidental and related expenses.

161. WHEREFORE, Plaintiff demands judgment against Defendant Abbott for compensatory damages, punitive damages where permitted, attorneys' fees where allowed by statute, costs of suit, pre- and post-judgment interest, and all such other and further relief as the Court deems just and proper.

**COUNT X: FRAUDULENT CONCEALMENT**

162. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

163. At all relevant times, Defendant, as manufacturer and distributor of a Class III PMA-approved medical device implanted in Plaintiff, had superior knowledge of material facts concerning the safety and performance of its SCS products that were not known to Plaintiff or to Plaintiff's treating physicians and were not reasonably discoverable through inspection. This superior knowledge, combined with Defendant's partial affirmative representations concerning the safety and efficacy of the Device, created an affirmative duty upon Defendant to disclose the concealed facts.[32]

164. Defendant and its agents knowingly concealed and/or with such utter disregard and recklessness as to whether it was true, material facts concerning the true nature and rate of the Device's failures and associated risks, including: (a) that the Abbott SCS leads had an unacceptably high real-world rate of lead fracture, insulation breach, and migration, substantially exceeding the rates reported in Defendant's manufacturer-funded clinical trials and the rates suggested by Defendant's marketing representations; (b) that published post-market data documented real-world lead migration and failure rates between 13.2% and 22.6%, data that was known to Defendant through its post-approval surveillance obligations but was not disclosed to patients or prescribing physicians in Defendant's marketing or promotional materials; (c) that Abbott's IPG/battery was

[32] 21 C.F.R. § 814.84 (PMA post-approval requirements, including annual reports, adverse event reporting, and PMA supplement obligations); ASRA, supra note 8

subject to documented firmware, software, and battery defects, as acknowledged in the September 2017 ERI Advisory, the June 2024 Urgent Device Correction, and the July 2023 Class I Recall; (d) that lead failure and IPG/battery malfunction could cause and were causing, in implanted patients, permanent nerve damage and neurological injury; (e) that reprogramming by Defendant's sales representatives could not remediate lead fracture, insulation breach, lead migration, IPG/battery malfunction, or resulting injury; and (f) that continued implantation of a failing SCS device would cause progressive, permanent nerve injury.

165. Defendant and its agents additionally concealed, from Plaintiff and Plaintiff's treating physicians, material facts concerning the qualifications and conduct of its sales and clinical representatives, including: (a) that these representatives were not licensed healthcare providers and were not authorized to perform the medical functions they were in fact performing; (b) that these representatives were operating outside the permissible scope of sales representative activity and were engaging in the unauthorized practice of medicine under Pennsylvania law; and (c) that these representatives were trained and incentivized to encourage device implantation and discourage device removal, regardless of patient symptoms, in a manner that prioritized Defendant's financial interests over patient welfare.

166. These concealed facts were material to Plaintiff's decisions concerning: (a) whether to consent to the trial implantation of an Abbott SCS device; (b) whether to consent to the permanent implantation of the Device; and (c) whether to seek timely removal of the Device after complications arose. A reasonable person in Plaintiff's position would have considered these facts important or material in deciding whether to undergo implantation of and continued exposure to the Device.

167. Defendant and its agents concealed these material facts with the intent to induce Plaintiff to consent to and maintain implantation of the Device, thereby generating and preserving revenue from Device sales and continued implantation. Defendant's concealment was not inadvertent or negligent. Instead, it was the product of a deliberate corporate strategy to maximize device adoption and minimize removal rates by withholding adverse information from patients and their physicians.

168. Plaintiff justifiably relied upon what, unknown to Plaintiff, was Defendant's concealment of these material facts. Plaintiff had no independent means of discovering the true rate of lead failure, IPG/battery malfunction, the progressive neurological risk of device retention following device failure, or the actual scope and limitations of Defendant's representatives' authority and qualifications. Plaintiff's reliance was reasonable given Defendant's superior knowledge, the medical setting of the interactions, and Defendant's affirmative representations concerning the Device's safety and the representatives' clinical support role.

169. As a direct and proximate result of Defendant's fraudulent concealment, Plaintiff consented to implantation of the Device, delayed seeking its removal following the onset of complications, and sustained permanent nerve damage that would not have occurred, or would have been substantially less severe, but for Defendant's concealment. Had Defendant disclosed the material facts described herein, Plaintiff would not have consented to implantation or would have sought timely removal of the Device.

170. As a direct and proximate result of Defendant's fraudulent concealment, Plaintiff suffered the injuries and damages described herein, including permanent nerve damage, chronic pain, and other losses including mental anguish, diminished enjoyment of life, medical, health, incidental, and related expenses.

WHEREFORE, Plaintiff demands judgment against Defendant Abbott for compensatory damages, punitive damages where permitted, attorneys' fees where allowed by statute, costs of suit, pre- and post-judgment interest, and all such other and further relief as the Court deems just and proper.

**COUNT XI: FRAUDULENT MISREPRESENTATION**

171. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

172. Defendant made the following specific affirmative representations of material fact, each of which was false when made or became false in light of subsequently known facts that Defendant failed to correct: (a) Defendant's patient-directed marketing materials represented that the Abbott SCS system is clinically proven to deliver pain relief and is safe for long-term implantation; (b) Defendant's representatives represented directly to Plaintiff that the Device would provide reliable, long-term pain relief; (c) Defendant's representatives represented to Plaintiff that the Device was safe for long-term implantation; (d) Defendant's representatives represented to Plaintiff, after complications arose, that the complications were attributable to sub-optimal device settings rather than device failure; and (e) Defendant's representatives represented to Plaintiff that reprogramming would resolve Plaintiff's complications.[33]

173. Each of these representations was false. Specifically: (a) the Device was not proven safe and effective for Plaintiff, as it caused lead failure, IPG/battery malfunction, uncontrolled electrical stimulation, and permanent nerve injury; (b) the real-world complication rates for Abbott SCS devices, including lead migration and failure rates of 13.2% to 22.6% documented in published peer-reviewed literature, materially undermined the safety representations made by Defendant in its marketing and by its representatives to Plaintiff; (c) the representations concerning long-term

[33] Abbott Neuromodulation product information. Available at: https://www.neuromodulation.abbott/us/en/healthcare-professionals/hcp-chronic-pain/proclaim-xr-scs-system.html.

efficacy were made without adequate post-market data supporting the claimed outcomes at the rates represented; (d) the representatives' characterization of Plaintiff's complications as addressable through reprogramming was false because reprogramming cannot remediate lead fracture, insulation breach, lead migration, or IPG/battery malfunction; and (e) Abbott's IPGs were subject to known firmware, software, and battery defects as documented in the September 2017 ERI Advisory, the June 2024 Urgent Device Correction, and the July 2023 Class I Recall — none of which were disclosed to Plaintiff.[34]

174. Defendant made each of these representations knowing they were false or with such utter disregard and recklessness as to their truth or falsity that scienter may be inferred. Defendant's corporate-level representatives possessed actual knowledge of the real-world post-market failure rates of its SCS leads and IPGs through MAUDE adverse event reporting, post-approval study data, and internal complaint-file data — none of which was accurately reflected in the safety representations made to patients and prescribers.

175. Defendant's agents and/or sales representatives possessed or were imputed with actual knowledge that the representations they made to Plaintiff concerning the significance of Plaintiff's complications and the efficacy of reprogramming were false, given their direct role in Device programming and their access to device performance data.

176. Defendant made these representations with the intent to induce Plaintiff to: (a) consent to the trial implantation of an Abbott SCS device; (b) consent to the permanent implantation of the Device; and (c) refrain from seeking removal of the Device after complications arose, thereby preserving Defendant's revenue from continued device deployment.

---

[34] ASRA, supra note 8; *see also* Kumar K et al., Spinal cord stimulation in treatment of chronic benign pain, Neurosurgery 58(3):481–496 (2006), https://doi.org/10.1227/01.NEU.0000192162.99567.96; Mekhail NA et al., Retrospective review of 707 cases of spinal cord stimulation, Pain Pract. 11(2):148–153 (2011), https://doi.org/10.1111/j.1533-2500.2010.00407.x.

177. Plaintiff justifiably relied upon Defendant's and its agents' representations in consenting to the implantation of the Device and in delaying the removal of the Device following the onset of complications. Plaintiff had no independent means of verifying the falsity of Defendant's representations at the time they were made. Plaintiff's reliance was reasonable in light of the medical setting, Defendant's superior knowledge as the device manufacturer, and the authority with which Defendant's representatives presented the representations.

178. As a direct and proximate result of Defendant's fraudulent misrepresentations, Plaintiff consented to implantation of the Device, delayed seeking its removal following the onset of complications, and sustained permanent nerve damage that would not have occurred, or would have been substantially less severe, but for Plaintiff's reliance on Defendant's false representations.

179. At all relevant times, Defendant is and has been vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships, including the sales and clinical representatives who made the representations described herein.

180. As a direct and proximate result of Defendant's fraudulent misrepresentation, Plaintiff suffered the injuries and damages described herein, including permanent nerve damage, chronic pain, and other losses including mental anguish, diminished enjoyment of life, medical, health, incidental, and related expenses.

181. WHEREFORE, Plaintiff demands judgment against Defendant Abbott for compensatory damages, punitive damages where permitted, attorneys' fees where allowed by statute, costs of suit, pre- and post-judgment interest, and all such other and further relief as the Court deems just and proper.

**COUNT XII: NEGLIGENT MISREPRESENTATION**

182. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

183. At all relevant times, Defendant was engaged in the business of designing, manufacturing, marketing, and distributing the Abbott SCS Products as Class III medical devices for the treatment of chronic intractable pain. In the course of that business, and for pecuniary purposes, Defendant supplied information to Plaintiff and to Plaintiff's treating physicians intended to guide those persons in their medical treatment decisions, including the decision to implant and retain the Device. Defendant had a pecuniary interest in the transactions in which it supplied this information, as Defendant's revenue was derived from device sales and implantations.

184. In the course of its business, Defendant and its agents supplied false information to Plaintiff for Plaintiff's guidance in the decision to undergo implantation and retain the Device. This false information included: (a) Defendant's public representations that the Abbott SCS system is clinically proven and safe for long-term implantation, when in fact real-world post-market data documented lead failure, lead migration, IPG/battery malfunction, and device complication rates that materially exceeded the rates suggested by those representations; (b) representations by Defendant's sales and clinical representatives to Plaintiff, before implantation, that the Device would provide reliable, long-term pain relief and was safe for long-term implantation, when Defendant lacked reasonable grounds for those representations given the known real-world performance data; and (c) representations by Defendant's representatives to Plaintiff, after complications arose, that the complications were attributable to sub-optimal programming rather than device failure and could be resolved through reprogramming, when the representatives lacked

reasonable grounds for that conclusion and when known medical literature indicated that lead failure and IPG/battery malfunction cannot be remediated through reprogramming.[35]

185. Defendant failed to exercise reasonable care or competence in obtaining or communicating the information supplied to Plaintiff. Specifically: (a) Defendant's corporate-level public representations concerning the safety and effectiveness of the Device failed to accurately reflect or account for known post-market adverse event data, including MAUDE reports and published peer-reviewed literature documenting lead migration and failure rates of 13.2% to 22.6%; (b) Defendant's sales representatives lacked the medical qualifications and training necessary to make the clinical representations they made to Plaintiff concerning the significance of Plaintiff's complications and the adequacy of reprogramming; and (c) Defendant's training of its representatives failed to ensure that representatives communicated accurate and complete information to patients concerning the risks of lead failure, IPG/battery malfunction, and the limitations of reprogramming as a remedy.

186. At all relevant times, Defendant is and has been vicariously responsible for the actions and omissions of its agents, servants, contractors, and employees acting within the course and scope of their respective agencies and employment relationships, including the sales and clinical representatives who supplied the false information described herein.

187. Plaintiff justifiably relied upon the false information supplied by Defendant in consenting to the implantation of the Device and in delaying the removal of the Device following the onset of complications. Plaintiff had no reasonable basis for independently verifying the accuracy of Defendant's representations at the time they were made, and Plaintiff's reliance was reasonable

[35] *Id.*

given the medical setting, Defendant's superior knowledge as the device manufacturer, and the authority with which Defendant's representatives communicated.

188. Defendant lacked reasonable grounds for believing the truth of the representations it made. Even if Defendant's corporate-level safety representations were made without actual knowledge of their falsity, those representations were made without the reasonable care and competence required by Pennsylvania law given the post-market surveillance data available to Defendant as a PMA-approved device manufacturer under 21 C.F.R. § 814.84.[36]

189. As a direct and proximate result of Defendant's negligent misrepresentation, Plaintiff consented to implantation of the Device, delayed seeking its removal following the onset of complications, and sustained permanent nerve damage that would not have occurred, or would have been substantially less severe, but for Plaintiff's justifiable reliance on Defendant's false representations.

190. As a direct and proximate result of Defendant's negligent misrepresentation, Plaintiff suffered the injuries and damages described herein, including permanent nerve damage, chronic pain, and other losses including mental anguish, diminished enjoyment of life, medical, health, incidental, and related expenses.

191. WHEREFORE, Plaintiff demands judgment against Defendant Abbott for compensatory damages, punitive damages where permitted, attorneys' fees where allowed by statute, costs of suit, pre- and post-judgment interest, and all such other and further relief as the Court deems just and proper.

[36] 21 C.F.R. § 814.84 (PMA post-approval requirements).

## COUNT XIII: PUNITIVE DAMAGES

192. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

193. Defendant acted with actual malice and/or in conscious disregard of the rights and safety of Plaintiff and similarly situated patients by:

- Knowingly marketing and distributing SCS devices that deviated from FDA-approved manufacturing specifications and cGMP requirements, while concealing known lead failure risks and IPG/battery malfunction risks from patients and physicians;
- Constructing and operating a corporate scheme by which sales and clinical representatives were deployed to engage in the unauthorized practice of medicine and to make material misrepresentations to patients for the purpose of maximizing device sales and preventing device removal, in knowing violation of Pennsylvania law;
- Making material misrepresentations to Plaintiff about the performance of the Device, the nature of Plaintiff's complications, and the efficacy of reprogramming as a remedy, while knowing these representations were false;
- Discouraging Plaintiff from seeking prompt removal of the failing Device while knowing that continued implantation of the failing Device would cause progressive and permanent nerve damage; and
- Retaining and continuing to deploy the Representative(s) after having actual or constructive knowledge of the Representative(s)' pattern of impermissible conduct.

194. Defendant's conduct reflects a systematic, willful, and conscious disregard for the rights and safety of Plaintiff and similarly situated patients, making an award of punitive damages appropriate to punish Defendant and deter similar conduct.

195. Plaintiff's claim for punitive damages is subject to the requirements set forth in Pennsylvania state law and will be pursued in accordance with the procedures set forth therein, including the requirement of clear and convincing evidence.

196. WHEREFORE, Plaintiff demands judgment against Defendant Abbott for compensatory damages, punitive damages as permitted, attorneys' fees where allowed by statute, costs of suit, pre- and post-judgment interest, and all such other and further relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Kim Doherty respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendant Abbott Laboratories and Abbott Medical, and award the following relief:

1. Compensatory damages for Plaintiff's physical injuries, permanent nerve damage, chronic pain, emotional distress, loss of enjoyment of life, past and future medical expenses, lost earnings and earning capacity, and all other economic and non-economic losses in an amount to be determined at trial;

2. Punitive damages as permitted for Defendant's malicious, egregiously fraudulent, or consciously indifferent conduct;

3. Reasonable attorneys' fees and costs of suit as permitted by applicable statute or common law;

4. Pre-judgment and post-judgment interest at the maximum rates permitted by applicable law; and

5. Such other and further relief, whether at law or in equity, as the Court deems just and proper.

Respectfully submitted,

**SPOTLIGHT JUSTICE PLLC**
Dena R. Young (308703)
200 Barr-Harbor Drive, Suite 400
Conshohocken, PA. 19428
(267) 281-7357
dena@spotlightjustice.com

**BULLOCK LEGAL GROUP, LLC**
Carasusana B. Wall (OH0090234) (*PHV forthcoming)*
Ameena Alauddin (OH 102588) (*PHV forthcoming)*
One Seagate, 550 N Summit St #710
Toledo, OH 43604
(833) 853-4258
(470) 412-6708 (facsimile)
Cara@bullocklegalgroup.com
Ameena@bullocklegalgroup.com

*Counsel for Plaintiff*

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

*/s/ Dena R. Young*

**SPOTLIGHT JUSTICE PLLC**
Dena Young